**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax.: (212) 701-5800
Amelia T.R. Starr
James I. McClammy
Benjamin Zhu
Garrett Cardillo
Benjamin D. Wasserman
*Attorneys for Michael Penner, as Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| ASCOT FUND LIMITED,[1] | )  Case No. 19-_____-__ |
| | ) |
| Debtor in a Foreign Proceeding. | )  Chapter 15 |
| | ) |

**DECLARATION OF MICHAEL PENNER IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF**

I, MICHAEL PENNER, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Michael Penner, CPA, CPA-CA. I am a partner in Deloitte & Touche Cayman Islands ("Deloitte") and am responsible for leading Deloitte's financial advisory practice in the Caribbean and Bermuda region.

2. On October 24, 2018, I was appointed as one of the two Joint Voluntary Liquidators (the "JVLs") over Ascot Fund Limited (the "Debtor" or "Ascot Fund") by Ascot

---

[1] Ascot Fund Limited is the debtor in this chapter 15 case (the "Chapter 15 Case"). Ascot Fund Limited is a Cayman Islands exempted limited liability company with registration number 41963. The location of Ascot Fund Limited's registered office is c/o Deloitte & Touche, PO Box 1787, One Capital Place, Shedden Road, Grand Cayman, KY1-1109, Cayman Islands.

Fund's voting shareholder at the recommendation of its board of directors. As a result, I am responsible for liquidating and distributing Ascot Fund's assets to its shareholders in accordance with Cayman Islands law.

3. On February 14, 2019, the Grand Court of the Cayman Islands (the "Cayman Court") entered an order (the "Appointment Order") pursuant to section 131(b) of the Cayman Islands Companies Law (2018 Revision) (the "Companies Law"), a copy of which is attached hereto as **Exhibit A**, bringing Ascot Fund's liquidation under court supervision (the "Cayman Proceeding"), appointing myself and Mr. Tim Derksen to act as joint official liquidators of the Debtor (the "JOLs"), and authorizing the JOLs to, among other things, seek recognition of their appointment in the United States pursuant to chapter 15 of title 11 of the United States Code (the "Bankruptcy Code"). The Appointment Order was filed on February 19, 2019.

4. I am submitting this declaration (the "Declaration") on its behalf in support of the (a) *Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "Verified Petition" [Dkt. No. 3], and together with the Voluntary Chapter 15 Petition [Dkt. No. 1], filed contemporaneously herewith, the "Petition") and (b) *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002(m), 2002(q) and 9007 for an Order Scheduling a Hearing on Recognition of Foreign Main Proceeding and Specifying Form and Manner of Service of Notice* [Dkt. No. 7] (the "Application").[2]

5. In preparing this Declaration, I have reviewed the Verified Petition and have been advised by counsel with respect to relevant provisions of the Companies Law and other provisions of Cayman Islands law as they relate to chapter 15 of the Bankruptcy Code and other aspects of U.S. bankruptcy law. All facts set forth in this Declaration are based on my

---

[2] Except as otherwise indicated, capitalized terms used herein shall have the meaning ascribed to them in the Verified Petition.

2

knowledge; my review of relevant documents; or my opinion based upon my experience and knowledge of the Debtor and advice of counsel received by me. If called upon to testify, I could and would testify competently to the facts set forth herein.

6. This Declaration comprises matters that are statements of legal opinion and/or statements of fact. Where the matters stated in this Declaration are statements of legal opinion, such statements represent the advice I have received from counsel as to Cayman Islands law and United States law, as applicable. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived from documents or information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge, information, and belief.

## OVERVIEW OF THE DEBTOR

7. Ascot Fund, a Cayman Islands Exempted Company, was established on February 7, 1992, and has its registered office c/o Deloitte & Touche, PO Box 1787, Grand Cayman, KY1-1109, Cayman Islands. Ascot Fund operates under its Amended and Restated Memorandum and Articles of Association of Ascot Fund Limited, dated October 31, 2006 (the "Articles of Association").

8. Ascot Fund serves as a Cayman Islands-based feeder fund to a U.S.-based master fund, Ascot Partners L.P., a Delaware limited partnership ("Ascot Partners"). Ascot Fund and Ascot Partners were founded by J. Ezra Merkin ("Merkin") and were managed by Gabriel Capital Corporation ("Gabriel"), of which Merkin was the principal.

9. Ascot Fund currently has 66 shareholders. In order to invest in Ascot Fund, each shareholder was required to represent that he, she, or it was not a U.S. person. Ascot Fund's

Subscription Agreement is attached as **Exhibit B**. The vast majority of shareholders in Ascot Fund have registered addresses outside the United States, and none are clearly located in any single jurisdiction.[3] Six of the Ascot Fund's shareholders are Cayman Islands entities. It is, in my experience, very common in a "master/feeder" structure for the Cayman Islands incorporated "feeder fund" (in this case, Ascot Fund) to accept subscriptions from non-U.S. persons and then invest those subscription proceeds in a "master fund."

10.     Ascot Fund invested substantially all of its assets in Ascot Partners as an admitted limited partner of Ascot Partners under the terms of a limited partnership agreement. In turn, Ascot Partners invested substantially all of its assets in or through Bernard L. Madoff Investment Securities LLC ("BLMIS"), the investment firm founded by Bernard L. Madoff ("Madoff").

11.     In December 2008, it was revealed that BLMIS was a Ponzi scheme. Ascot Fund subsequently received a large number of redemption requests from its shareholders. Under the exigent circumstances presented by the revelation of the Madoff fraud and to ensure equitable treatment of all shareholders, the directors of Ascot Fund suspended the right to redeem shares in Ascot Fund in accordance with its Articles of Association.

12.     Until my appointment as voluntary liquidator, Ascot Fund's board of directors consisted of two independent Cayman Islands-based directors, Lori Webb-Griffith and Don Seymour of DMS Governance Ltd. ("DMS Governance"), a company management firm licensed and regulated under the laws of the Cayman Islands. Ms. Webb-Griffith and Mr. Seymour were appointed as directors on May 23, 2016, and December 28, 2001, respectively, and have at all relevant times been based on the Cayman Islands. Mr. Aldo Ghisletta, who resided in the Cayman Islands, was a director of Ascot Fund from November 30, 2002 through May 31, 2016.

---

[3] Ascot Fund has five participating shareholders that have registered addresses in the United States. It is my understanding that these shareholders acquired their interests in Ascot Fund on the secondary market.

4

I understand that Ascot Fund's board of directors conferred regularly in the Cayman Islands to conduct the business of Ascot Fund by unanimous written resolution. The board of directors also communicated with Ascot Fund's shareholders, communications which made clear that the board was based in the Cayman Islands, as evidenced most recently by the Investor Update Letter of October 24, 2018, attached as **Exhibit C**.

13.     Ascot Fund has been independently administered by Estera Fund Services ("Estera") since December 2009. Estera, which is based in a number of jurisdictions, including the Cayman Islands, provides a comprehensive offering for the structuring, incorporation, setup and ongoing administration of offshore fund structures. Estera maintains the register of participating shareholders of Ascot Fund at its office in the Isle of Man, but it has an office in the Cayman Islands. See https://estera.com/jurisdictions/cayman-islands.aspx.

14.     Ascot Fund's current assets include $1.248 million of cash held in bank accounts in the Cayman Islands with DMS Bank & Trust Ltd. ("DMS Bank") and The Bank of N.T. Butterfield & Son Ltd. ("Butterfield Bank"). DMS Bank is a Cayman Islands-based banking institution and Butterfield Bank is a Bermuda-based banking institution. In addition, the only other asset of Ascot Fund is its claim in Ascot Partners.

### The Madoff-Related Litigations

15.     Ascot Fund has remained in operation for the purpose of distributing proceeds recoverable from various Madoff-related litigations.

*The Merkin Litigation*

16.     In 2009, the New York Attorney General sued Merkin and related companies alleging that Merkin caused Ascot Partners and Ascot Fund, among other companies, to suffer significant financial losses in connection with the collapse of the Madoff Ponzi scheme. See

5

People v. Merkin, Index No. 450879/2009 (N.Y. Sup. Ct.) (the "Merkin Litigation").  Ascot Fund was joined in the Merkin Litigation solely in the capacity of a "Relief Defendant."

17. It is my understanding that Ascot Partners has been managed by a court-appointed receiver (the "Ascot Partners Receiver") in connection with the Merkin Litigation since 2009.

18. In 2012, the New York Attorney General reached a settlement with Merkin whereby Merkin paid $410 million in return for dismissal of the Merkin Litigation (the "Merkin Settlement").  The Merkin Settlement provided that the consideration paid by Merkin would be distributed directly to investors in Ascot Fund, as well as investors of other funds.

19. In connection with the Merkin Settlement, Ascot Fund gave releases to the defendants in the Merkin Litigation in order to ensure that Ascot Fund investors were able to participate in the Merkin Settlement.  Ascot Fund separately signed the Merkin Settlement agreement.

20. Ascot Fund did not receive any distributions from the Merkin Settlement, nor did Ascot Fund or its directors play any role in determining the plan of distribution under the Merkin Settlement.  Instead, it is my understanding that Merkin Settlement distributions were calculated and managed directly by Guidepost Partners, a service provider hired by the Ascot Partners Receiver.

*The Picard Litigation*

21. Also in 2009, Irving H. Picard, as Trustee of BLMIS, commenced an adversary proceeding in the United States Bankruptcy Court for the Southern District of New York against Merkin and Gabriel, as well as Ascot Partners and Ascot Fund in the capacity of "relief defendants."  Picard v. Merkin, No. 09-01182 (SMB) (Bankr. S.D.N.Y.) (the "Picard Litigation").

22.     On July 3, 2018, the Bankruptcy Court for the Southern District of New York (Bernstein, J.) approved a settlement in the Picard Litigation.  Pursuant to this settlement, Ascot Partners received $40,628,311.35 and is expected to receive a further $12.4 million (and potentially more) (the "Picard Settlement Funds").

23.     I understand that the Ascot Partners Receiver is currently formulating a plan to distribute the Picard Settlement Funds to its limited partners, including Ascot Fund.  Upon receiving its share of the Picard Settlement Funds, Ascot Fund will, in turn, distribute the funds to its shareholders in accordance with Ascot Fund's governing documents.

## CONTRARIAN DISPUTE REGARDING DISTRIBUTION METHOD

24.     On July 19, 2018, Ascot Fund's board of directors (the "Board") received a letter from Contrarian Funds, LLC ("Contrarian") regarding Ascot Fund's future distribution of the Picard Settlement Funds (the "July 2018 Letter").  Contrarian, a Delaware limited liability company, is the sole shareholder of hfc Limited ("hfc"), an investor in Ascot Fund.  Like Ascot Fund, hfc is also a Cayman Islands exempted company, having its registered office at Citco Fund Services (Cayman Islands) Limited, 89 Nexus Way, 2nd floor, PO Box 31106, Camana Bay, Grand Cayman, KY1-1205, Cayman Islands.  Contrarian acquired its interest in Ascot Fund on the secondary market in August and September 2017.

25.     In its July 2018 Letter, Contrarian asked the Board to negotiate a distribution from the Ascot Partners Receiver (consisting of Ascot Fund's portion of the Picard Settlement Funds) directly to Ascot Fund's investors based on a "net invested capital methodology."

26.     Ascot Fund, through its Cayman Islands counsel, Maples and Calder, responded to Contrarian's letter on July 30, 2018, stating that it shared Contrarian's goal of ensuring that, "insofar as possible, the Ascot Fund's share of the net proceeds of the BLMIS Settlement are

7

returned to Ascot Fund's investors as soon as possible." Ascot Fund also emphasized that it "ha[d] no desire for the resolution of this process to take longer or cost more than is reasonably necessary." But Ascot Fund also informed Contrarian that the Board's fiduciary duties required it to "conduct the affairs of the Ascot Fund in accordance with its governing documents and Cayman Islands law," which did not permit the directors to ignore the separate corporate personality of Ascot Fund (which was, in effect, what Contrarian was seeking in suggesting that Ascot Fund directors acquiesce in distributions being made directly from Ascot Partner to Ascot Fund's investors under U.S. law, as though Ascot Fund did not exist).

27. In later correspondence, Contrarian appeared to change its position, apparently accepting that it was appropriate for Ascot Fund to handle distributions to its shareholders, but arguing that distribution adjustments were necessary in light of the Merkin Settlement.

28. Based on our preliminary assessments, if Ascot Fund were to implement Contrarian's requested distribution methodology, the distributions would likely favor Ascot Fund's largest investors and those few investors that did not participate in the Merkin Settlement. Smaller investors, who participated in the Merkin Settlement and received a Merkin Settlement distribution which was proportionally larger to their "net invested capital" amount (than larger investors), stand to receive potentially no further distributions pursuant to the above-mentioned distribution methodology.

29. In an October 2018 update to shareholders, Ascot Fund informed shareholders that one shareholder (namely hfc) had raised the issue of the eventual distribution method. Recognizing that the shareholder had raised an "arguable" question under Cayman Islands law, and that Ascot Fund's Board did not have the ability to apply to the Cayman Court for direction on the issue, Ascot Fund's Board informed shareholders that Ascot Fund had resolved to appoint

voluntary liquidators to facilitate an orderly and equitable liquidation, and that the JVLs may "seek to bring [the liquidation] under the supervision of the [Cayman Court]" so that distribution-related disputes "can be dealt with in as efficient manner as possible, and in a collective proceeding in which different shareholders (or groups of shareholders) can have their point of view represented." The shareholder update also noted that "if Court supervision is obtained, the Liquidators may also seek recognition under Chapter 15 of the United States Bankruptcy Code."

## THE NEW YORK LITIGATION

30. On December 13, 2018, Contrarian initiated a lawsuit in the Supreme Court of New York County, No. 656210/2018, against Ascot Partners and Ascot Fund (the "New York Litigation") seeking, among other things, (a) a preliminary injunction barring the defendants from disbursing the Picard Settlement Funds; (b) appointment of a temporary receiver over Ascot Fund; and (c) a declaratory judgment setting forth the proper distribution methodology of any future distributions by Ascot Fund.[4]

31. Ascot Fund opposed Contrarian's motion for a preliminary injunction and appointment of a temporary receiver and simultaneously moved to dismiss the complaint because, among other reasons, Contrarian lacked standing to prosecute the New York Litigation because it was not a shareholder of Ascot Fund.

32. On February 5, 2019, hfc filed an amended complaint in the New York Litigation ("Amended Compliant") substituting hfc as plaintiff, dropping Ascot Partners as a defendant, and dropping its request for a preliminary injunction. The Amended Complaint, however, still seeks (a) appointment of a temporary receiver over Ascot Fund; and (b) a declaration concerning

---

[4] Contrarian also alleged fraudulent misrepresentation and breach of contract claims, as well as an action for an accounting.

the proper distribution methodology to be applied by Ascot Fund for any future disbursements. No other shareholders of Ascot Fund are a party to the New York Litigation.

33. The New York Litigation is ongoing. If necessary, Ascot Fund intends to oppose the Amended Complaint on March 12, 2019. A hearing on hfc's request for a temporary receiver is scheduled for April 11, 2019.

## THE CAYMAN ISLANDS LIQUIDATION PROCEEDING

34. On October 24, 2018, the sole voting shareholder of Ascot Fund, DMS Bank in the Cayman Islands, resolved to (a) place Ascot Fund into voluntary liquidation, pursuant to section 116(c) of the Companies Law; and (b) appoint Mr. Derksen and myself as JVLs. This resolution is attached as **Exhibit D**.

35. The voting shares of Ascot Fund were held by DMS Bank pursuant to a STAR trust arrangement, whereby another Cayman Islands-based independent third party played the role of "Enforcer." In this case, the Enforcer of the trust was Sackville Bank and Trust Company Limited, also a Cayman Islands-based entity. Before DMS Bank could vote the shares to place Ascot Fund into voluntary liquidation, the Enforcer was required to give permission, which in turn it should do only if it considered that the action was in the best interests of the Ascot Fund and its shareholders as a whole. The Enforcer did indeed reach that conclusion. The Approval of the Enforcer of the Ascot Fund Limited STAR Trust, dated October 23, 2018, is attached as **Exhibit E**.

36. On October 24, 2018, all shareholders of Ascot Fund were advised of the JVLs' appointment in a letter sent by Ascot Fund's Board. See **Exhibit C**. Upon the JVLs filing our consents to act with the Cayman Islands Registrar of Companies, the Board's powers were then suspended, and we took control of Ascot Fund as voluntary liquidators of Ascot Fund.

37. On January 16, 2019, we initiated the Cayman Proceeding by filing a Petition for Court Supervision in the Cayman Court (the "Cayman Islands Petition") and provided notice of the Cayman Islands Petition to all shareholders of Ascot Fund. In our submissions supporting the Cayman Islands Petition, we stated that the Cayman Proceeding would "enable[] the liquidators to seek recognition under Chapter 15 of the United States Bankruptcy Code which, if granted (and subject to any other conditions the United States Bankruptcy Code imposes or orders it makes) would also operate as a stay of proceedings in the United States."

38. No party opposed the Cayman Islands Petition.

39. On February 14, 2019, the Cayman Court granted the relief sought in the Cayman Islands Petition and entered the Appointment Order (a) declaring that Ascot Fund's liquidation be continued under court supervision pursuant to section 131 of the Companies Law; (b) appointing myself and Mr. Tim Derksen, both of Deloitte, as JOLs of the Debtor, and (c) authorizing the JOLs to, among other things, seek recognition of their appointment in the United States pursuant to chapter 15 of the Bankruptcy Code. In our capacity as JOLs, we will be supervised by, and we will be officers of, the Cayman Court. At all relevant times that we have served as JVLs or JOLs, we have been based in the Cayman Islands.

40. As JOLs of Ascot Fund, we plan to continue to work with our Cayman Islands lawyers to determine the proper distribution method of its assets under Cayman Islands law. In the event there remains any controversy regarding the distribution (including because hfc, or indeed some other shareholder, disagrees with the proposed approach to distribution), it would then be our intention to file a sanction application in the Cayman Proceeding seeking a determination of the proper distribution method of Ascot Fund's assets. See Eldridge Declaration ¶ 21.1. As part of that sanction application, we would seek directions designed to

11

ensure that all points of view among the shareholders (including those being advanced by hfc) were properly represented at the hearing, so that the Cayman Court could properly consider the competing arguments and make a fully informed decision.

41.    Moreover, while we plan to vigorously defend the New York Litigation if necessary, it is our intention to resolve the distribution method question in accordance with Cayman Islands law and in the best interests of all stakeholders in Ascot Fund, whether large or small.  To that end, we have filed the Petition to seek recognition of the Cayman Proceeding to ensure an efficient, orderly, and fair liquidation process during which each shareholder shall be afforded due process and an opportunity to have their arguments and point of view heard in the Cayman Proceeding, both by the JOLs and by the Cayman Court.

## REQUESTS FOR RECOGNITION AND RELATED RELIEF

42.    In connection with the filing of this Chapter 15 Case, on behalf of the Debtor, I submitted the Petition.  In addition to the facts set forth above, I believe, after consultation with counsel, that the relief requested in the Petition is necessary to maximize value for Ascot Fund's shareholders and is an integral element of the Debtor's liquidation in the Cayman Islands.

43.    As explained in the Petition, the relief requested therein is necessary to (a) ensure that all of Ascot Fund's shareholders are able to be heard with respect to the distribution methodology applied by Ascot Fund in any future distributions and (b) protect Ascot Fund from any lawsuits in the United States that may seek a determination of that question to the exclusion of Ascot Fund's other shareholders.

44.    The Debtor has property in the United States and, specifically, in this jurisdiction. Davis Polk & Wardwell ("Davis Polk"), as counsel to the Foreign Representative and counsel for the Debtor, holds US $50,000 in a noninterest-bearing client trust account located in New York

(the "Retainer Account").  The funds remain in the Retainer Account as of the date hereof and are the Debtor's property (subject to Davis Polk's applicable rights).  I understand that this satisfies section 109(a) of the Bankruptcy Code.

45.     To the best of my knowledge and belief, after consultation with counsel, the Cayman Proceeding (a) constitutes a "foreign main proceeding" within the meaning of 11 U.S.C. § 1502(4), as the Debtor is incorporated in and has its registered office in the Cayman Islands, which is its center of main interests; and (b) qualifies as a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23), as a judicial proceeding in the Cayman Islands under Cayman Islands law relating to the adjustment of debt in which the assets and affairs of the Debtor is subject to control and supervision of the Cayman Court for the purpose of liquidation.

46.     Finally, as described in the Petition and as discussed with counsel, I understand and believe that recognizing the Cayman Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and the public policy of the United States.  Therefore, I believe that the relief requested in the Petition is necessary and appropriate and in the best interests of the Debtor, its shareholders, and all other interested parties.

### SECTION 1515(c) STATEMENT

47.     I am informed by counsel that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

48.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to my knowledge, the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Debtor is the Cayman Proceeding.

13

**LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)**

49.     I am informed that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a foreign representative filing a petition for recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

(A) a corporate ownership statement containing the information described in [Bankruptcy] Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the [Bankruptcy] Code.

In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

a)      Corporate Ownership Statement: In accordance with Bankruptcy Rules 1007(a)(4) and 7007.1, I understand that no individuals, corporations or other entities directly or indirectly own 10% or more of the Debtor's equity interests as of February 25, 2019, other than Aozora Bank Limited, hfc Limited, and Gilla Green. Since February 25, 2019, the Debtor has not received any notification otherwise that would lead me to believe that the same is not true as of the date of this Declaration.

b)      Persons or Bodies Authorized to Administer the Foreign Proceeding: I am duly appointed as foreign representative of the Debtor pursuant to the Appointment Order. My contact address is: Michael Penner, PO Box 1787, One Capital Place, Shedden Road, Grand Cayman, KY1-1109, Cayman Islands.

c)      Pending Litigation: I am currently unaware of any litigation pending in the United States in which the Debtor is a party, other than the New York Litigation, which is a lawsuit filed by hfc limited, a Cayman Islands exempted company with a registered office located at Citco Fund Services (Cayman Islands) Limited, 89 Nexus Way, 2nd Floor, PO Box

31106, Camana Bay, Grand Cayman, KY1-1205, Cayman Islands, against Ascot Fund pending in New York Supreme Court, Commercial Division (Index No. 656210/2018). The New York Litigation seeks, inter alia, appointment of a temporary and permanent receiver over Ascot Fund and a declaration concerning the methodology applied to future distributions to Ascot Fund shareholders. I am not aware of any preferences or fraudulent transfers that are subject to avoidance under the relevant provisions of the Bankruptcy Code.

        d)    <u>Provisional Relief</u>: Upon advice of counsel, I am not seeking provisional relief at this time because I am not aware of any imminent threat to the Debtor's assets located in the United States or to the Cayman Proceeding by virtue of actions in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 25, 2019
Grand Cayman, Cayman Islands

_____
Michael Penner