UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X

In re:                                      :        Chapter 15
                                            :
        ASCOT FUND LIMITED,                 :        Case No. 19-10594 (SMB)
                                            :
        Debtor in a Foreign Proceeding.     :
----------------------------------------------X

## MEMORANDUM DECISION GRANTING
## RECOGNITION AS FOREIGN MAIN PROCEEDING

**A P P E A R A N C E S :**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

        Amelia T.R. Starr, Esq.
        James I. McClammy, Esq.
        Benjamin Zhu, Esq.
        Garrett Cardillo, Esq.
        Benjamin D. Wasserman, Esq.

                Of Counsel

*Attorneys for Michael Penner,*
   *as Foreign Representative*

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019

        Andrew K. Glenn, Esq.
        Gavin D. Schryver, Esq.
        David Koch, Esq.
        GraceAnn Caramico, Esq.

                Of Counsel

*Attorneys for hfc Limited*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

        The debtor, Ascot Fund Ltd. ("Ascot Fund"), an investment fund organized under

Cayman Islands law, invested all or substantially all of its assets in Ascot Partners L.P.

("Ascot Partners"), a Delaware limited partnership.  Ascot Partners, in turn, invested all or substantially all of its assets with Bernard L. Madoff Investment Securities, LLC ("BLMIS"), the vehicle through which Bernard Madoff ran his notorious Ponzi scheme. When Madoff's fraud was revealed in December 2008 and the scheme collapsed, the BLMIS investors, direct (*e.g.*, Ascot Partners) and indirect (*e.g.*, Ascot Fund), lost their investments.

As a result of certain settlements described below, Ascot Partners now holds substantial assets available for distribution and some of that money will be down streamed to Ascot Fund, and ultimately, Ascot Fund's shareholders.  Ascot Fund is currently in liquidation in the Cayman Islands ("Cayman Proceeding") and one of its Joint Official Liquidators ("JOLs"), Mr. Michael Penner ("Petitioner"), has filed a petition under chapter 15 of the United States Bankruptcy Code ("Petition") seeking recognition of the Cayman Proceeding as a foreign main proceeding.  hfc Limited ("Objector"), an Ascot Fund investor, opposes the Petition.  It contends that Ascot Fund's center of main interests, or COMI, is not in the Cayman Islands and the Cayman Proceeding cannot, therefore, be recognized as a foreign main proceeding.  The Court conducted a one-day trial, overrules the objection and grants the Petition.

**BACKGROUND**

**A. Events Leading to the Liquidation Proceedings**

Ascot Fund is an investment fund that was formed under Cayman Islands law on February 7, 1992.  It served as a Cayman Islands-based feeder fund to a U.S.-based

master fund, Ascot Partners, a Delaware limited partnership. (Ex. 2[1] at ¶ 8.) Ascot Fund and Ascot Partners were founded by J. Ezra Merkin ("Merkin") and were managed by Gabriel Capital Corporation, of which Merkin was the principal. (*Id.*) Ascot Fund invested substantially all of its assets in Ascot Partners as an admitted limited partner of Ascot Partners, and Ascot Partners invested substantially all of its assets in or through BLMIS, Madoff's investment firm. (*Id.* at ¶ 10.) In December 2008, after the BLMIS Ponzi scheme came to light, Ascot Fund received a large number of shareholder redemption requests. (*Id.* at ¶ 11.) Under those exigent circumstances, Ascot Fund's Board of Directors ("Board") suspended the right to redeem shares in Ascot Fund in accordance with its Articles of Association, (*id.*), and did not engage in any further investment activities. In fact, its sole activity involved participation in litigation arising out of its connection to BLMIS.[2]

### 1. The Merkin Litigation

In 2009, the New York Attorney General sued Merkin and related entities alleging that Merkin caused investors in Ascot Partners and Ascot Fund, among others, to suffer losses in connection with the Madoff Ponzi scheme. *See People v. Merkin*, Index No. 450879/2009 (N.Y. Sup. Ct.) ("Merkin Litigation"). The New York Supreme Court presiding over the Merkin Litigation appointed a receiver for Ascot Partners

---

[1]    "Ex." refers to the trial exhibits, all joint exhibits, received in evidence.

[2]    Prior to 2003, Ascot Fund had its own investment account with BLMIS. *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 126, 160 (Bankr. S.D.N.Y. 2014).

("Receiver").  (Ex. 78.)  Ascot Fund was joined solely as a "relief defendant."  (Ex. 2 at ¶ 16.)

In 2012, the New York Attorney General reached a settlement with Merkin and his related entities under which Merkin agreed to pay $410 million in exchange for dismissal and certain releases ("Merkin Settlement").  (Ex. 2 at ¶¶ 18, 19.)  Eligible investors—including shareholders in Ascot Fund—could participate directly in the settlement in exchange for providing certain releases.  (*See* Ex. 84.)  Ascot Fund itself did not receive any distributions from the Merkin Settlement and neither Ascot Fund nor its directors played any role in determining the distribution plan under the Merkin Settlement.  (Ex. 2 at ¶ 20.)

### 2.  The Picard Litigation

Also in 2009, Irving H. Picard, as trustee ("Trustee") for the liquidation of BLMIS under the Securities Investor Protection Act ("SIPA"), commenced an adversary proceeding against, *inter alia*, Merkin, Ascot Partners and Ascot Fund.  *Picard v. Merkin*, Adv Pro. No. 09-01182 (SMB) (Bankr. S.D.N.Y.) ("Picard Litigation").  The third amended complaint asserted claims against Ascot Fund as an initial transferee of BLMIS and as a subsequent transferee of other initial transferees.  In addition, the plaintiff sought to disallow or equitably subordinate any claims Ascot Fund might have filed in the SIPA proceeding.  The fraudulent transfer claims asserted against Ascot Fund as an initial transferee were dismissed with prejudice by stipulation of the parties.  (*See Stipulation and Limited Order of Dismissal With Prejudice*, dated Dec. 19, 2013 (ECF Adv Pro. No. 09-01182 Doc. # 189).)  Following motions to dismiss, the Court

4

declined to dismiss subsequent transfer claims relating to initial transfers made within two years of the December 11, 2008 filing date of the BLMIS liquidation proceeding, including subsequent transfer claims asserted against Ascot Fund, and also denied the motion to the extent it sought dismissal of the equitable subordination claims.

On July 3, 2018, this Court approved a settlement ("Picard Settlement") in the Picard Litigation. (Ex. 94.) Pursuant to the Picard Settlement,[3] Ascot Partners received an allowed customer claim in the sum of $501,734,338.00. From its catch-up distribution of $320,628,311.35, it paid the Trustee $280 million, leaving a balance of $40,628,311.35. In addition, Ascot Partners will be entitled to receive additional distributions on a *pari passu* basis with other customers holding allowed customer claims. (*See* Ex. 2 at ¶ 22.) Don Seymour, a director of Ascot Fund, signed the Picard Settlement on Ascot Fund's behalf. (Ex. 61 at AF-0000710.) Based on its receipt of the settlement proceeds and possible future distributions, Ascot Partners has a substantial amount of money to distribute to its investors.

### 3. The Distribution Dispute

Although the JOLs have not adopted and the Cayman Court has not approved a distribution methodology, the Objector, a shareholder of the Ascot Fund, (Ex. 2 at ¶ 24), is concerned that a distribution methodology adopted by the Ascot Fund Board will be less favorable to it than any distribution methodology a New York court might adopt governing distributions from Ascot Partners to Ascot Fund or directly to Ascot Fund's

---

[3]    A copy of the Picard Settlement is attached as an exhibit to Ex. 61.

shareholders.[4]  Following the Picard Settlement, Contrarian Funds, LLC ("Contrarian"), a Delaware limited liability company that controls the Objector, (*id.*), wrote to the Board raising a number of contentions with respect to the anticipated distributions of the Picard Settlement.  (Ex. 30, 32.)  It focused on two points.  First, the Receiver should bypass Ascot Fund and make the distributions directly to Ascot Fund investors, as occurred with the Merkin Settlement.  Second, if the Receiver instead made the distribution to Ascot Fund, any distributions that Ascot Fund shareholders received through the earlier Merkin Settlement should reduce their claims.  This distribution methodology would likely favor Ascot Fund's largest investors and those few investors that did not participate in the Merkin Settlement.[5]  (Ex. 2 at ¶ 28.)  Smaller investors who participated in the Merkin Settlement and received a distribution proportionally larger to their "net invested capital" amount than larger investors might not receive any further distributions leaving more for the Objector.

## B. The Liquidation Proceeding

In light of the controversy created by Contrarian, the Board determined that it would be in the best interest of Ascot Fund to commence a voluntary liquidation under the management of independent liquidators.  (Ex. 2 at ¶ 29; Exs. 5, 52.)  On October 24, 2018, the Board recommended such an appointment, and the sole voting shareholder,

---

[4]    On April 24, 2019, the Receiver filed a motion in New York state court to establish procedures for distribution of Ascot Partners' assets to Ascot Partners' investors.  (Exs. 95-105.)  If the proposed procedures are approved, each Ascot Partners investor, including Ascot Fund, will be informed of its proposed distribution amount and will have an opportunity to object to the distribution methodology.  (*See* Ex. 98.)

[5]    Approximately 85.5% of Ascot Fund investors opted to participate in the Merkin Settlement and Distribution Agreement.  (Recognition Hr'g Tr. 76:7-11 (ECF Doc. # 48).)

DMS Bank & Trust Ltd. ("DMS Bank"), appointed the Petitioner and Timothy Derksen as Ascot Fund's Joint Voluntary Liquidators ("JVLs").[6]  The appointment of the JVLs commenced Ascot Fund's liquidation and provided the JVLs with authority under the Cayman Islands Companies Law (2018 Revision) (the "Companies Law") to manage Ascot Fund in the course of its liquidation.  (Ex. 2 at ¶¶ 34-35; Exs. 6 & 7.)[7]  Upon the JVLs filing their consents to act with the Cayman Islands Registrar of Companies, the Board's powers were suspended and the JVLs assumed full managerial control over Ascot Fund under Cayman law.  (Ex. 2 at ¶ 36; Ex. 10 at 67 (*Companies (Winding Up) Rules 2018*, O.13, r.3 (the voluntary liquidator "shall have all the powers of an official liquidator . . . and may exercise those powers without the sanction of a resolution of the company's members")).)

Immediately upon assuming their duties, the JVLs wrote to the Ascot Fund shareholders.  Their letter advised the shareholders of the dispute relating to the distribution methodology and explained that the dispute prompted the filing of the voluntary liquidation.  The letter also stated that the dispute may require the JVLs to bring the liquidation proceeding under the supervision of the Grand Court of the Cayman Islands ("Cayman Court") and seek recognition under chapter 15 of the Bankruptcy Code.

---

[6]    The JVLs are partners at Deloitte & Touche Cayman Islands ("Deloitte").

[7]    Participating shareholders in Ascot Fund do not have voting rights.  The voting shares in Ascot Fund are instead held by DMS Bank pursuant to the terms of a STAR Trust, whereby another Cayman Islands-based independent third party played the role of "Enforcer."  In this case, the Enforcer of the trust was Sackville Bank and Trust Company ("Sackville Bank"), also a Cayman Islands-based entity.  (Ex. 2 at ¶ 35.)  Sackville Bank, as the Enforcer, authorized the commencement of the liquidation proceedings.

Not content with leaving the issue to the JVLs or the Cayman Court, Contrarian commenced an action on December 13, 2018 in the New York Supreme Court (Index No. 656210/2018) (the "New York Litigation") against Ascot Fund seeking, among other things, (a) a preliminary injunction barring the defendants from disbursing the Picard Settlement funds; (b) appointment of a temporary receiver over Ascot Fund; and (c) a declaratory judgment setting forth the distribution methodology of any future distributions by Ascot Fund. (Ex. 15.) In an amended complaint filed by the Objector, the request for a preliminary injunction was dropped but the Objector acknowledged that it was filed, among other things, "to avoid a Cayman liquidation whose duration and cost will resemble a familiar Dickensian tale," (Ex. 15 at ¶ 6), and seek (a) a declaration concerning Ascot Fund's distribution methodology, (*id.* at ¶¶ 39-48), and (b) the appointment of a temporary receiver over Ascot Fund. (*Id.* at ¶¶ 49-53.) No other shareholders of Ascot Fund are parties to the New York Litigation. (Ex. 2 at ¶ 32.)

On January 16, 2019, the Petitioner and Derksen responded by commencing the Cayman Proceeding and bringing Ascot Fund's liquidation under the Cayman Court's supervision. At the February 14, 2019 hearing, which Contrarian and the Objector attended, (Ex. 12 at 1:16-17), the Cayman Court noted that Contrarian and the Objector had "expressed concerns [in the New York Litigation] about the ability of the Cayman Islands liquidation to adequately and efficiently determine the allocation method which is in controversy." (*Id.* at 2:12-14.) The Cayman Court responded:

> And so it seems to me that the liquidators and the Court should accept the challenge of Contrarian to demonstrate that a winding-up under the Court's supervision can be an effective mechanism and I would invite the liquidators to use their best endeavours to expedite the process of resolving the allocation issues, assuming they are able to successfully

obtain the stay of the US proceedings.  That is one of the most important
initial steps that they propose to take.

(*Id.* at 2:25-30.)  Following the hearing, the Cayman Court entered an order (the

"Appointment Order") (Ex. 3) pursuant to section 131(b) of the Companies Law,

bringing Ascot Fund's liquidation under court supervision and appointing the

Petitioner and Derksen to act as JOLs with authority to act jointly and severally.

(*Id.* at ¶ 2.)  Among other things, the Appointment Order granted the JOLs the

power to file a chapter 15 case, (*id.* at ¶ 4.2), and defend the New York Litigation.

(*Id.* at ¶ 4.3.)

The gauntlet thrown, the Petitioner filed the chapter 15 petition on February 25,

2019 ("Petition Date").  The Court conducted the recognition hearing on May 2, 2019 at

which one witness, the Petitioner, testified.  The Court also received 106 joint trial

exhibits.

## DISCUSSION

### A.  Jurisdiction, Venue and Eligibility

The United States District Court for the Southern District of New York has

subject matter jurisdiction over this chapter 15 case, 28 U.S.C. § 1334(a), and the

recognition hearing is a core proceeding, 28 U.S.C. § 157(b)(2)(P), which "arises under"

the Bankruptcy Code and is also within the District Court's subject matter jurisdiction.

28 U.S.C. § 1334(b).  As authorized by 28 U.S.C. § 157(a), the United States District

Court has referred cases and proceedings within its bankruptcy jurisdiction to this

Court, *Amended Standing Order of Reference,* No. M 10-468, 12 Misc. 00032 (S.D.N.Y.

Jan. 31, 2012), and accordingly, this Court has subject matter jurisdiction over the chapter 15 case and the recognition hearing.

Venue is proper under 28 U.S.C. § 1410(1) and has not been contested.  As of the Petition Date, Ascot Fund's assets included a limited partnership interest in Ascot Partners which is managed by the New York Receiver, (*see* Ex. 2 at ¶¶ 14, 17), an interest in a retainer with Davis Polk & Wardwell LLP in New York, (Ex. 14 at ¶ 3), and a claim based on an agreement in principle pursuant to which the Receiver will pay the expenses incurred in connection with Ascot Fund's wind down in the amount of $100,000 subject to the approval of the New York and Cayman Courts.  (Ex. 106 at ¶¶ 2-3.)

For the same reason, Ascot Fund is eligible to be a debtor under the United States Bankruptcy Code.  Bankruptcy Code § 109(a), which applies to a debtor under chapter 15, *Drawbridge Special Opportunities Fund LP v. Barnet* (*In re Barnet*), 737 F.3d 238, 247-51 (2d Cir. 2013), provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."  11 U.S.C. § 109(a).  Ascot Fund's rights in the Davis Polk retainer, its limited partner interest in Ascot Partners and its claim against the Receiver all constitute property in the United States.

## B.  Standards Governing Recognition

Section 1517(a) of the Bankruptcy Code establishes the statutory requirements for recognition.  Subject to a narrow public policy exception, *see* 11 U.S.C. § 1506, which the Objector does not contend applies, the Court must grant recognition, if it finds that:

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.[8]

The Objector has not challenged the Petitioner's satisfaction of the second or third factors (arguing the Court need not reach them), and the Petitioner has plainly met them. Bankruptcy Code § 101(23) defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." The Cayman Proceeding is a collective proceeding governed by the Companies Law through which Ascot Fund's financial affairs will be wound up and its assets distributed to creditors, here the shareholders. In addition, the Cayman Proceeding is overseen by the Cayman Court. Moreover, courts in

---

[8]    Section 1515 deals with the requirements that the petition must meet. It states in relevant part:

(b) A petition for recognition shall be accompanied by-

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

The Petitioner has provided a copy of the Appointment Order commencing the Cayman Proceeding and appointing the Petitioner and Derksen as the JOLs. (Ex. 3.) The Appointment Order was received in evidence without objection and is acceptable evidence of the commencement and existence of the Cayman Proceeding and the appointment of the JOLs.

this district have consistently recognized Cayman Islands liquidation proceedings as
"foreign proceedings" for purposes of chapter 15 of the Bankruptcy Code. *See, e.g., In re
Ocean Rig UDW Inc.*, 570 B.R. 687, 701-02 (Bankr. S.D.N.Y. 2017), *appeal dismissed*,
585 B.R. 31 (S.D.N.Y. 2018), *aff'd*, 764 F. App'x 46 (2d Cir. 2019) (summary order); *In
re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 403-04 (Bankr. S.D.N.Y. 2014); *In
re Millard*, 501 B.R. 644, 648-50 (Bankr. S.D.N.Y. 2013).

Next, the Petitioner is a "foreign representative." Bankruptcy Code § 101(24)
defines "foreign representative" as "a person or body, including a person or body
appointed on an interim basis, authorized in a foreign proceeding to administer the
reorganization or the liquidation of the debtor's assets or affairs or to act as a
representative of such foreign proceeding." Bankruptcy Code § 101(41) defines "person"
to include an individual. The Petitioner, an individual, is a "person," and the
Appointment Order authorizes the JOLs, acting jointly or severally, to administer Ascot
Fund's liquidation.

### C. COMI

The sole question disputed and litigated by the parties is whether the Cayman
Proceeding can be recognized as a "foreign main proceeding."[9] A "'foreign main
proceeding' means a foreign proceeding pending in the country where the debtor has the
center of its main interests," 11 U.S.C. § 1502(4), or COMI. "The relevant principle . . . is
that the COMI lies where the debtor conducts its regular business, so that the place is

---

[9]     The Petitioner does not seek recognition as a "foreign nonmain proceeding."

ascertainable by third parties." *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 130 (2d Cir. 2013) ("*Fairfield Sentry*"). "In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). "[A] debtor's COMI is determined as of the time of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition." *Fairfield Sentry*, 714 F.3d at 133. The following non-exclusive group of factors guides the analysis, "but consideration of these specific factors is neither required nor dispositive":

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* at 137 (quoting *In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007)). The specific factors are not limiting; the COMI analysis permits consideration of any relevant activities, including liquidation activities and administrative functions, *id.*, and a court may also consider the "expectations of creditors." *In re Millenium Glob. Emerging Credit Master Fund Ltd.,* 474 B.R. 88, 93 (S.D.N.Y. 2011); *accord In re OAS S.A.*, 533 B.R. 83, 102 (Bankr. S.D.N.Y. 2015). The party seeking recognition as a foreign main proceeding must prove by a preponderance of the evidence that the debtor's COMI is in the jurisdiction where the foreign main proceeding is pending, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 90-91 (Bankr. S.D.N.Y. 2012), 351 B.R. at 117, although, as noted, chapter 15 creates a rebuttable presumption

13

that the debtor's registered office is its COMI.

### 1.  The Location of Ascot Fund's Headquarters and Management

Ascot Fund's registered address has been located in the Cayman Islands since its formation in 1992, (Ex. 17 at ¶ 8(b)), and hence, the Cayman Islands is presumed to be its COMI.  As further proof of its pre-liquidation Cayman Islands COMI, the Board directed Ascot Fund's affairs, and the Board members resided or were based in the Cayman Islands.  (Ex. 2 at ¶ 12.)  Lori Webb-Griffith and Don Seymour of DMS Governance Ltd. ("DMS Governance"), a company management firm licensed and regulated under the laws of the Cayman Islands, were appointed as directors on May 23, 2016, and December 28, 2001, respectively, and served on the Board until the appointment of the JVLs on October 24, 2018.  (*Id.*; Ex. 23 at 7.)  Mr. Aldo Ghisletta, who also was based in the Cayman Islands, was a director of Ascot Fund from November 30, 2002 through May 31, 2016.  (Ex. 2 at ¶ 12.)  Additionally, Ascot Fund's sole voting shareholder, DMS Bank, is a Cayman Islands entity, as is Sackville Bank, the Enforcer under the STAR Trust arrangement governing Ascot Fund.  (Ex. 2 at ¶¶ 12, 14, 34, 35.)

The Board conferred regularly in the Cayman Islands to conduct Ascot Fund's business.  (Ex. 2 at ¶ 12.)  Ms. Webb-Griffith, as director of Ascot Fund, authorized the transfer of the shares from Fulcrum Credit Partners LLC to the Objector on August 30, 2017, (Ex. 20), and Ms. Webb-Griffith and Mr. Seymour, as directors of Ascot Fund, authorized a second transfer of shares from Fulcrum Credit Partners LLC on September 20, 2017.  (Ex. 21.)  Ascot Fund signed the Merkin Settlement and related releases in

2012, (*see* Ex. 25 at p. 3-4),[10] and Mr. Seymour signed the Picard Settlement on behalf of Ascot Fund.  (Exs. 61, 64.)

Both before and after the liquidation, Ascot Fund has employed Estera Fund Services ("Estera") to provide administrative services.  (Ex. 2 ¶ 13; Recognition Hr'g Tr. 21:19-20, 37:1-5.)  Estera has offices throughout the world, including the Cayman Islands, (Ex. 2 at ¶ 13), but the principal Estera employee responsible for Ascot Fund is located in the Isle of Man where it maintains Ascot Fund's register of shareholders. (*Id.*; Recognition Hr'g Tr. 40:5-13.)  The Objector places great significance on the fact that Estera works out of the Isle of Man, (*see hfc Limited's Proposed Findings of Fact and Conclusions of Law in Opposition to the Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief*, dated May 29, 2019, at ¶¶ 22, 23, 59 ("*Objector's Proposed Findings and Conclusions*") (ECF Doc. # 52)), but does not contend that Estera played any role with respect to the activities that the Objector relies on to argue that Ascot Fund's pre and post-liquidation activities have been centered in New York or that the Isle of Man is its COMI.

The Cayman-centric management of Ascot Fund did not change with the appointment of the JVLs or the JOLs who are members of Deloitte and based in the Cayman Islands.  (Ex. 2 at ¶ 39.)  Ascot Fund's registered office beginning with the appointment of the JVLs and at the time of the commencement of the chapter 15 case

---

[10]    The parties did not mark the Merkin Settlement as a joint trial exhibit.

was c/o Deloitte & Touche, PO Box 1787, Grand Cayman, KY1-1109, Cayman Islands.[11]

(Ex. 2 at ¶ 7.)  The JOLs are based in the Cayman Islands, (Ex. 2 at ¶ 39), and they,

along with their staff at Deloitte, have directed and conducted Ascot Fund's liquidation

in the Cayman Islands.  (Ex. 17 at ¶ 8(c).)  Immediately upon the commencement of the

voluntary liquidation, a representative of Deloitte reached out to Ascot Fund's New York

lawyers to advise them that the JVLs had assumed control of Ascot Fund and sought

information about the Receiver's plans for distributing the Picard Litigation proceeds:

> We are reaching out on behalf of Ascot Fund Limited ("Ascot").  Ascot was placed into voluntary liquidation, and two of my Partners, Michael Penner and Timothy Derksen are the appointed liquidators ("Liquidators"). We have effectively assumed control from Lori Griffith and Don Seymour, who were the directors of Ascot.
>
> Our mandate is to wind up Ascot, realise the remaining asset, which is the interest in Ascot Partners LP and make distribution payments to Ascot investors.  We understand that the Receiver is formulating its distribution plan to investors of Ascot Partners LP, as such it would be useful to have a call to understand where the Receiver is in that process and related timings.

(Ex. 57 at Bates No. AF-0000648.)

The JVLs also requested and received a list of the distributions to shareholders in

Ascot Fund from the Merkin Settlement.  (*Id.* at Bates Nos. AF-0000644, AF-0000653.)

Following receipt of the distribution list, they again followed up with New York counsel

requesting the schedule of net invested capital for each Ascot Fund shareholder in order

to reconcile the net invested capital with the settlement amounts paid to the

---

[11]    There is no postal delivery service in the Cayman Islands, and every individual and business maintains a post office box at the post office.  (Recognition Hr'g Tr. 12:23-13:12.)  Ascot Fund's post office box had been registered to DMS Governance, the entity that employed its directors, and is now registered to Deloitte.  (*Id.* at 13:4-23.)

shareholders.  (*Id.* at Bates No. AF-0000652.)  The JVLs also engaged legal counsel in the Cayman Islands and New York and consulted with them regarding the distribution dispute and communicated with the Receiver and his legal counsel regarding this issue. (Ex. 25 at 12.)  As JOLs, they have continued to defend the New York lawsuit brought by the Objector and prosecute the chapter 15 case.  (*Id.*)

While the distribution dispute and litigation brought against the Ascot Fund in New York and the chapter 15 case commenced in response have occupied most of their time, the JVLs and JOLs have also attended to other more mundane aspects of the Cayman Proceeding.  They notified the Cayman Islands Registrar of Companies of their appointment as JVLs and JOLs and advertised their appointment as JVLs in the Cayman Islands' Gazette, (*id.*), communicated with DMS Governance and Estera in connection with Ascot Fund's administration and record keeping, (*id.*), opened a bank account in the Cayman Islands at Butterfield Bank, (Ex. 28), communicated with shareholders, sent them updates and answered their questions regarding Ascot Fund's liquidation, the New York Litigation, and the Cayman Proceeding (Exs. 25 at 12; 37, 41, 42, 43, 44), and directed and supervised Estera's work in updating shareholder records and information.  (Recognition Hr'g Tr. 20:2-21:13.)

The Objector's central argument in opposition is that Ascot Fund has been engaged in a "soft wind-down" since December 2008 and its only activities have occurred in New York where it has "piggybacked" on the Receiver's liquidation activities in New York and acceded control to him in the settlement of the Merkin Litigation and the distribution of the Merkin Settlement proceeds directly to the Ascot Fund

17

shareholders.  (*See Objector's Proposed Findings and Conclusion* at ¶¶ 7, 37-38.)
Similarly, it acquiesced to the Picard Litigation and the imminent distribution from the
SIPA estate is governed by U.S. law.  (*See id.* at ¶ 39; *accord* ¶ 41 ("The question before
the Court now is whether the minor, ministerial actions that the Cayman Liquidators
have conducted since their appointment — such as providing investors with banal
updates and producing a statutorily-required report, in addition to initiating the
Cayman Island Proceeding and participating in the chapter 15 process to seek
recognition . . .  — are sufficient to shift Ascot Fund's COMI to the Cayman Islands.").)
In contrast, Ascot Fund's Cayman activities have been ministerial.  (*Id.* at ¶¶ 34, 46.)

It is certainly true that Ascot Fund has not been engaged in the investment
business since the BLMIS Ponzi scheme came to light.  The same may be said of the
other offshore funds and fund-of-funds, including Fairfield, Kingate, Harley, *etc.*, that
invested all of their money with BLMIS and are now in liquidation in their home
countries.  Since then, Ascot Fund's only significant activity has been its participation in
New York litigation.  Not coincidentally, New York was where BLMIS operated and
where the SEC, the Securities Investor Protection Corporation, the United States
Attorney and Mr. Picard have commenced their various proceedings relating to Madoff
and BLMIS.  As a result of its direct relationship to Ascot Partners and its indirect
relationship to BLMIS, Ascot Fund was dragged into the Merkin Litigation as a relief
defendant and the Picard Litigation as an initial and subsequent transferee of BLMIS.
To these two litigations we can now add the lawsuit originally commenced by Contrarian
in New York Supreme Court.

18

This does not mean that the New York litigations define Ascot Fund's COMI or, as the Objector implies, Ascot Fund was the Receiver's silent partner in the Merkin and Picard Litigations or the resulting settlements. In the Merkin Litigation, the New York Attorney General did not seek any relief against the Ascot Fund, but instead, sought and obtained relief on behalf of the Ascot Fund shareholders as well as other indirect investors in BLMIS. As noted, Ascot Fund, not the Receiver, approved the Merkin Settlement and granted the releases on behalf of Ascot Fund.

Nor did Ascot Fund "piggyback" on the Receiver's defense of the Picard Litigation. While both were represented by the same counsel, they had different rights and faced different potential liabilities. Ascot Fund (but not Ascot Partners) stipulated with Picard to dismiss the initial fraudulent transfer claims but remained a defendant on the subsequent transfer claims. In a subsequent motion for summary judgment made by the defendants, the Court dismissed the subsequent transfer claims brought against Ascot Partners but denied the same motion by Ascot Fund. *Picard v. Merkin* (*In re BLMIS*), 563 B.R. 737, 751-54 (Bankr. S.D.N.Y. 2017). When Picard and the remaining defendants reached a settlement, Mr. Seymour, not the Receiver, signed the settlement on behalf of Ascot Fund.

The Objector's principal authorities, *SPhinX, Ltd.*, 351 B.R. 103 and *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008), are distinguishable. In *SPhinX*, the JOLs sought recognition of a Cayman proceeding, *inter alia*, as a foreign main proceeding. The Court noted that the debtors' business had been managed outside

19

the Cayman Islands and the business transacted in the Cayman Islands was primarily ministerial, the debtor had no employees, managers, or offices in the Cayman Islands, the debtors' board did not include any Cayman Islands residents and never met in the Cayman Islands, most of its assets were in the United States and most of the investors and creditors were located outside of the Cayman Islands.  *SPhinX, Ltd.*, 351 B.R. at 119.

Despite these facts, the Court nonetheless stated that it would still normally recognize the Cayman Islands proceeding as a foreign main proceeding.  The JOLs were competent, they were the only individuals ready to perform the winding up function and the vast majority of the parties in interest supported the Cayman proceeding as evidenced by the fact that only one party objected.  *Id.* at 120-21.  However, it ultimately refused to recognize the Cayman Islands proceeding as a foreign main proceeding because the chapter 15 petition had been filed as a litigation tactic to frustrate a settlement in the United States and obtain the benefit of the automatic stay to stop any appeals.  *Id.* at 121.  "[T]he strategy taints the JOLs' request and the investors' consent to it, giving the clear appearance of improper forum shopping."  *Id.*

Initially, the *Sphinx* Court focused on the debtor's business activities before the petition date, but since *Fairfield Sentry*, courts are required to assess COMI on the date the chapter 15 petition is filed with a lookback period to the date of the commencement of the foreign proceeding to decide whether COMI has been manipulated.  By the time the JOLs filed Ascot Fund's chapter 15 case, Ascot Fund had not carried on any investment activity in New York or anywhere else for over ten years.  Further, unlike the

20

non-resident directors in that case, Ascot Fund has always had directors that reside or were based in the Cayman Islands.

More importantly, the situation that tilted the scales in *Sphinx* is reversed. Ascot Fund entered into a voluntary liquidation for the purpose of resolving the brewing dispute over the distribution methodology. Rather than litigate that issue in a Cayman Court, where all parties in interest could be heard, Contrarian filed a preemptive lawsuit in New York, taken over by the Objector where only it could be heard, and where it thought it would obtain a larger payout, for the admitted purpose of avoiding a Cayman Proceeding, (*see* Ex. 15 at ¶ 6). As they informed the shareholders they might do on the day they were appointed, the JVLs then sought a court-supervised liquidation and filed a chapter 15 to counter the Objector's preemptive lawsuit and return the decision to a collective proceeding in the Cayman Islands where the Objector had agreed to litigate the dispute when it acquired its shares and all investors would have a chance to appear and be heard.

In *Bear Stearns*, the Joint Provisional Liquidators ("JPLs") overseeing a Cayman provisional liquidation sought recognition, *inter alia*, as a foreign main proceeding. The Court denied the application because the only "adhesive connection" with the Cayman Islands was that the debtors were registered there. *Bear Stearns*, 374 B.R. at 129-30. The debtors had no employees or managers in the Cayman Islands and the debtors' investment manager and managed assets were in New York, the administrator was a U.S. entity that ran the debtors' "back-office operations" in the United States, the debtors' books and records were located in the United States, all of the debtors' liquid

assets were in the United States and two of the debtors' four investors, although registered Cayman companies, had the "same minimum Cayman Islands profile" as the debtors. *Id.* at 130.

Like *Sphinx* and many other cases decided before *Fairfield Sentry*, the Court focused on the debtors' business activities before the commencement of the foreign proceeding rather than on the JPLs' activities at the time the chapter 15 petition was filed. As stated, Ascot Fund's investments have not been "managed" for over ten years. While Estera maintains Ascot Fund's records in the Isle of Man, Ascot Fund also maintains records in the Cayman Islands at DMS Governance and Deloitte. (Ex. 26 at 16; *see* Ex. 25 at 12.) Furthermore, Estera takes direction from the JOLs who are running the official liquidation under the supervision of the Cayman Court.

In short, the Cayman Islands is presumed to be Ascot Fund's COMI and the Objector has failed to rebut that presumption. But even if it had, the Petitioner has shown by a preponderance of the evidence that the location of Ascot Fund's headquarters and those who managed it were situated in the Cayman Islands on the Petition Date. In addition, COMI has not been manipulated as Ascot Fund's principal place of business has always been in the Cayman Islands and the documents and agreements discussed immediately below provided that the liquidation of Ascot Fund would occur in the Cayman Islands under Cayman law. Accordingly, the location of the Ascot Fund's headquarters and management weigh in favor of recognition.

22

## 2. The Governing Law, Appropriate Forum and the Creditors' Expectations.

From the Ascot Fund investors' point of view, and as a matter of fact and law, they invested in a Cayman fund and their rights were to be determined under Cayman law. Ascot Fund operated under the Amended and Restated Memorandum and Articles of Association of Ascot Fund Limited, dated Oct. 31, 2006 (the "Articles"). (Ex. 2 at ¶ 7; Ex. 19.) The Articles were governed by Cayman law[12] and provided the rules for distributions from Ascot Fund, *including distributions in the event of a liquidation.* (Ex. 19 at ¶¶ 180-88, 200-02.) Each shareholder signed a subscription agreement (the "Subscription Agreement") (Ex. 4) which was governed by Cayman law, (*id.* at 10, § III.C), and stated that Ascot Fund was a Cayman company governed by Cayman law. (Ex. 4 at 1, 4.) Investments in Ascot Fund were solicited through a confidential offering memorandum (the "Confidential Offering Memorandum"), dated October 2006, (Ex. 22), which informed its investors that "Ascot Fund Limited is a Cayman Islands exempted company"[13] "organized to operate as a private investment fund to facilitate investment by non-U.S. Persons and any investors that the Fund's board of directors deems appropriate," (*id.* at 16), and subject to the regulations of the Cayman Islands Monetary Authority. (*Id.* at iii-iv.)

---

[12]    The numerous references to the "Statute" in the Articles refer to the Companies Law (2004 Revision) of the Cayman Islands. (Ex. 19 at 4.)

[13]    A company may register as an "exempted company" if its "objects" are carried on mainly outside the Cayman Islands. (Companies Law § 163.) A registered "exempted company" may not trade in the Cayman Islands except in furtherance of its business outside the Cayman Islands but nothing prevents the "exempted company" from "effecting and concluding contracts in the Islands and exercising in the Islands all of its powers necessary for the carrying on of its business outside the Islands." (*Id.* § 174.) Section 193 of the 2004 Revision of the Companies Law was to the same effect. *Sphinx*, 351 B.R. at 107 n. 2.

The Objector seems to imply that New York law will determine any dispute between the Ascot Fund and its shareholders because Ascot Fund's principal asset is its limited partner interest in Ascot Partners.  (*See Objector's Proposed Findings and Conclusions* at ¶ 50.)  This assertion conflates two distinct distributions.  The first, from Ascot Partners to Ascot Fund, will be determined presumably under either Delaware or New York law and in accordance with the relevant Ascot Partners documents and will be subject to the approval of the New York court.  The second, from Ascot Fund to its shareholders should be determined under Cayman law in accordance with the Ascot Fund documents and will be subject to the approval of the Cayman Court.  Furthermore, the Objector's statement that "there are no disputes arising from the Fund's liquidation actually pending in the Cayman Islands," (*Objector's Proposed Findings and Conclusions* at ¶ 55), is circular and disingenuous.  There are no disputes pending in the Cayman Islands because the Objector is trying to bypass the Cayman Court and have the New York Supreme Court decide its dispute regarding the appropriate distribution methodology (that may *not* be in dispute depending on the methodology proposed by the JOLs).

In addition, shareholders understood that their rights against Ascot Fund, and specifically in the case of liquidation, would be determined by a Cayman Court, not the New York Supreme Court.  Each investor agreed to submit to the jurisdiction of the Cayman courts to adjudicate any dispute arising out of the Subscription Agreement or transactions relating thereto.  (Ex. 4 at 10, § III.D.)  And under the Deeds of Acknowledgment and Waiver, which are subject to Cayman law, the Objector agreed to submit to the exclusive jurisdiction of the Cayman courts with respect to disputes.  (Exs.

24

20 and 21 at ¶ 19.)  Thus, while Delaware or New York law will determine how the

Receiver will distribute Ascot Partners assets to the Ascot Fund, Cayman law will govern

how Ascot Fund's assets will be distributed to its shareholders consistent with the Ascot

Fund's documents and the expectations of its shareholders.  These factors weigh heavily

in favor of recognition.

### 3.  The Location of the Creditors

Ascot Fund's sixty-six creditors (*i.e.*, its shareholders) are scattered throughout

the world.  (*See* Ex. 58.)  This is not surprising given the nature of Ascot Fund's business

as an offshore investment fund designed to attract non-U.S. Persons.  (Ex. 22 at 1, 16.)

The largest group, numbering fourteen, have registered addresses in Switzerland.  Only

nine shareholders are registered in New York.  Five shareholders are registered in the

Cayman Islands.  (*See* Ex. 58.)  They include the Objector.  (Ex. 2 at ¶ 24.)  This factor is

neutral.[14]

### 4.  The Location of Assets

As noted, Ascot Fund's only significant asset is its limited partner interest in

Ascot Partners.  The value of this asset ultimately depends on the value of Ascot

Partners' customer claim in the BLMIS liquidation and the distribution that the

Receiver makes to Ascot Fund as a limited partner of Ascot Partners.  Thus, Ascot

---

[14]    At an early stage in this litigation, the Objector sought discovery aimed at showing that Ascot Fund's shareholders were actually subsidiaries of, controlled by, or affiliated with, non-Cayman entities. (Ex. 26 at 5 (Question No. 4).)  The Court sustained the Petitioner's objection to the request, declining to conduct what amounted to mini-trials into the COMIs of each shareholder.  Moreover, the undisclosed identity of parents, affiliates and controlling entities were irrelevant to the ascertainability of Ascot Fund's COMI.

Fund's principal asset is located either in Delaware where Ascot Partners was formed or in New York, where its Receiver operates, *cf. Krys v. Farnum Place, LLC* (*In re Fairfield Sentry Ltd.*), 768 F.3d 239, 245 (2d Cir. 2014) (the situs of a customer's claim against BLMIS is the location of the SIPA Trustee in New York), but not in the Cayman Islands. This factor weighs against recognition.

Nevertheless, it does not follow, as the Objector argues, that the location of this asset is "the key piece of evidence 'ascertainable by third parties.'" (*Objector's Proposed Findings and Conclusions* at ¶ 50.) While the Objector bought shares in Ascot Fund in 2017, those who invested pursuant to the 2006 Confidential Offering Memorandum had no idea that they would become embroiled in New York litigations involving a Ponzi scheme or depend on the SIPA liquidation of BLMIS with whom they never dealt. Rather, the only situs ascertainable as Ascot Fund's COMI, based on the fund documents described above, was the Cayman Islands.

### 5. Other Factors

Finally, the Objector argues that the Cayman Proceeding lacks an "air of legitimacy" because it was commenced by Ascot Fund's management unilaterally without consulting its shareholders "for the sole reason of thwarting the New York action and earning professional fees for themselves." (*Objector's Proposed Findings and Conclusions* at ¶ 61.) In the first place, Ascot Fund's sole voting shareholder and its Enforcer approved the voluntary liquidation. In the second place, the Objector has missed the obvious fact that its New York lawsuit constitutes a collateral attack on a Cayman liquidation and the Cayman Court's jurisdiction, not the other way around, for

26

the "sole" purpose of thwarting the liquidation in order to enhance its distribution from a limited pool of cash available to satisfy the claims of all Ascot Fund shareholders.  No other shareholder has opposed the Cayman Proceeding, and the Objector (and Contrarian) who did attend the hearing in the Cayman Islands did not oppose the official liquidation or the appointment of the JOLs.  Assuming they have not forfeited opposition to the Cayman Proceeding and the appointment of the JOLs, they are free to argue to the Cayman Court that the proceeding should be dismissed because it lacks an "air of legitimacy."

Having considered the evidence and weighed the factors pertinent to the question of recognition, the Petition is granted, the Cayman Proceeding is recognized as a foreign main proceeding and the Petitioner is recognized and granted the status of the foreign representative in accordance with chapter 15 of the Bankruptcy Code.  The Court has considered the Objector's remaining arguments and concludes that they lack merit.  The Petitioner is directed to settle an order on notice to the Objector.

Dated: New York, New York
       August 12, 2019

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge